**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 9 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 00-7022 |
| | (E.D. Okla.) |
| AUGUSTIN SOLA EKPETI, | (D.Ct. No. 99-CR-41-S) |
| Defendant-Appellant. | |

_____

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR, McKAY,** and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Appellant Augustin Sola Ekpeti appeals his jury convictions for the

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

interstate transportation of stolen vehicles in violation of 18 U.S.C. §§ 2312 and 2(b) and resulting twenty-one month concurrent sentences. On appeal, Mr. Ekpeti argues: 1) insufficient evidence supported his jury convictions for transporting stolen property; 2) the district court improperly enhanced his sentence under United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(4)(A) for "more than minimal planning" in committing the crimes underlying his conviction; and 3) the government improperly failed to request a downward departure motion under U.S.S.G. § 5K1.1 for his "substantial assistance" in its investigation. We exercise our jurisdiction under 28 U.S.C. § 1291 and affirm.

Factual Background

The relevant facts pertinent to our disposition follow.[1] Beginning in 1995, Mr. Ekpeti owned and operated Ausnet Security and Intelligence, Inc. (Ausnet), a Miami-based security service company. In the summer of 1998, Ausnet obtained a security contract with a federal army ammunition plant in McAlester, Oklahoma. The terms of the contract required Ausnet to provide, in part, twelve specially equipped white trucks or vehicles for use on security patrol routes. The

---

[1] In outlining the facts on direct appeal, we view the evidence in the light most favorable to the government. *See United States v. Magleby*, No. 99-4245, 241 F.3d 1306, 1312(10th Cir. 2001).

contract terms further designated October 1, 1998 as the performance date.

In preparing for the contract, Mr. Ekpeti hired Jerry Holloway, a resident of McAlester, as the local manager for the project. In order to raise funds necessary for purchasing the twelve vehicles required, Mr. Ekpeti unsuccessfully sought financing prior to the October 1, 1998 performance date. As of October 1, 1998, Mr. Ekpeti had only one vehicle with which to perform the contract. Consequently, Mr. Ekpeti requested and received an extension from the government until October 23, 1998 to begin performance. In order to get an extension, Mr. Ekpeti made false statements a hurricane damaged his vehicles and as proof, submitted a false repair invoice to the government.

Mr. Ekpeti sought assistance from his friend, Mr. Robert Inyang, in acquiring the necessary vehicles. Mr. Ekpeti claims he believed Mr. Inyang obtained vehicles for him from government auctions. Each time Mr. Inyang obtained a vehicle, he brought it to Mr. Ekpeti's Miami business where Ausnet employees immediately sent the vehicles for painting and equipping. Ultimately, Mr. Ekpeti shipped the twelve vehicles to McAlester, but not in time to meet the October, 23, 1998 contract performance date. As a result, the government canceled the contract. In the meantime, the first shipment of vehicles arrived in

McAlester on or about October 24, 1998, and the second shipment arrived one day later. Mr. Ekpeti received permission from Mr. Holloway to store the twelve vehicles at Mr. Holloway's home in McAlester until Mr. Ekpeti could retrieve them.

A few months after delivery of the subject vehicles, Mr. Ekpeti and others began retrieving the vehicles from Mr. Holloway's property. On March 26, 1999, Mr. Ekpeti drove one of the twelve vehicles, accompanied by four passengers, to McAlester to retrieve some of the other vehicles. On reaching McAlester, a police officer stopped Mr. Ekpeti for a traffic offense. The vehicle was registered to Mr. Ekpeti's secretary, LaToya Sands, but a subsequent check verified the registration statement was fraudulent. Immediately after his arrest, a Federal Bureau of Investigation agent interviewed Mr. Ekpeti, who stated he owned the vehicle, paid in excess of $20,000 for it, and registered it in his secretary's name because he did not have identification with him when he registered it. A subsequent investigation revealed the vehicle was reported stolen on October 22, 1998 – just a few days before its shipment to McAlester. Further investigation showed all twelve vehicles transported to McAlester had altered vehicle identification numbers and fraudulent registration statements, and Mr. Ekpeti did not have titles for eleven vehicles. When federal agents later contacted Mr.

Ekpeti at his Miami home, they discovered another stolen vehicle, in addition to the twelve at issue. Mr. Ekpeti then took them to Mr. Inyang's office, which ultimately lead agents to seize another vehicle and arrest Mr. Inyang.

A grand jury returned a twelve-count indictment against Mr. Ekpeti for the unlawful interstate transportation of twelve stolen motor vehicles from Florida to Oklahoma in violation of 18 U.S.C. §§ 2312 and 2(b). At trial, Mr. Ekpeti testified in his own defense. Mr. Ekpeti testified he paid Mr. Inyang approximately $207,000 to buy twelve vehicles he believed Mr. Inyang purchased at government actions. Except for one check payment in the amount of $8,179, Mr. Ekpeti stated he paid Mr. Inyang cash. Although Mr. Ekpeti experienced difficulty obtaining financing for the twelve vehicles, he testified he paid Mr Inyang cash from loan proceeds received from family, friends and two financing companies as well as from other Ausnet customers' check payments, which he had his secretary cash rather than deposit into the company account. During his testimony, Mr. Ekpeti did not know how much, if any, of the $135,000 loan from one of the financing companies was spent on the vehicles. He also did not offer any documentary evidence establishing he acquired these loans.

Mr. Ekpeti also testified Mr. Inyang registered and tagged the vehicles, but

Mr. Ekpeti admitted he provided Mr. Inyang the names used for registration of the vehicles. These included: his own name; his wife's maiden name, Connie Ingram; Mr. Inyang's name; his secretary's name, LaToya Sands; the fictitious or unknown persons "Khalil (or Calisle) Glover," "Hugh F. Smith" and "Clinton West"; and "Ausnet Sec[u]rities, Inc." and "Ausnet Security, Inc." In explaining why he instructed Mr. Inyang to register one vehicle in his secretary's name, Mr. Ekpeti testified he planned to give it to her after performance of the contract. Mr. Ekpeti also testified he never saw the vehicle registration statements or knew the vehicles were stolen or that their identification numbers were altered. Finally, he explained he never possessed titles to eleven of the vehicles because he expected to receive them from the auctioneer.

The jury found Mr. Ekpeti guilty on all counts, except for the vehicle described in count three.[2] Mr. Ekpeti filed motions for a new trial and judgment of acquittal, which the district court denied. Following a sentencing hearing, the district court sentenced Mr. Ekpeti to concurrent twenty-one month terms of imprisonment for each of the eleven counts, followed by concurrent three-year

---

[2] Count three involved a Dodge Ram pickup – the only vehicle for which Mr. Ekpeti possessed a bill of sale and title and actually participated in the purchase of with Mr. Inyang from an individual in South Carolina.

terms of supervised release, and ordered restitution of $101,136.75 and a special monetary assessment of $1,100.

## A. Sufficiency of the Evidence

We review *de novo* the sufficiency of the evidence supporting a conviction. *See Magleby,* 241 F.3d at 1311. When reviewing sufficiency of the evidence claims, "we must ask only whether taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find [the] Defendant guilty beyond a reasonable doubt." *Id.* (quotation marks, citation and alteration omitted). "We will only overturn a jury verdict if 'no reasonable juror could have reached the disputed verdict.'" *Id.* (quoting *United States v. Whitney*, 229 F.3d 1296, 1300-01 (10th Cir. 2000). "In a sufficiency challenge, we review the record as a whole and consider the collective inferences reasonably drawn therefrom." *Id.* Where conflicting evidence exists or when the record allows for conflicting findings, "we do not question the jury's conclusions regarding the credibility of witnesses or the relative weight of evidence," but instead "presume that the trier of fact resolved any such conflicts in favor of the prosecution." *Id.* (quotations marks and citations omitted).

To convict under 18 U.S.C. § 2312,[3] the government had to prove the eleven vehicles were stolen, Mr. Ekpeti transported the vehicles in interstate commerce, and Mr. Ekpeti knew the vehicles were stolen. *See United States v. Brazeal*, 464 F.2d 1, 2 (10th Cir. 1972). On appeal, Mr. Ekpeti only contests the last element; he claims the evidence failed to show he knew the eleven vehicles at issue were stolen when he transported them to Oklahoma. We and other circuits have held a presumption of knowledge may be drawn from the unexplained, or unsatisfactorily explained, possession of recently stolen vehicles recently transported in interstate commerce. *See United States v. Mansaw*, 714 F.2d 785, 792 (8th Cir.), *cert. denied*, 464 U.S. 986 (1983); *United States v. Prazak*, 623 F.2d 152, 155 (10th Cir.), *cert. denied*, 449 U.S. 880 (1980); *United States v. Calloway*, 562 F.2d 615, 617 (10th Cir. 1977); *United States v. Casey*, 540 F.2d 811, 816 (5th Cir. 1976).

In this case, a review of the record shows circumstantial evidence, together with the collective inferences drawn therefrom, sufficiently support the jury's verdict. To begin, it is undisputed Mr. Ekpeti possessed eleven recently stolen vehicles at the time he transported them through interstate commerce. However,

---

[3] This section, along with 18 U.S.C. §§ 10, 2311 and 2313 are commonly known as the National Motor Vehicle Theft Act or alternatively, the Dyer Act.

his unsatisfactory explanations on the circumstances surrounding his possession of stolen vehicles give rise to a presumption he knew they were stolen. *See Calloway*, 562 F.2d at 617.

For instance, Mr. Ekpeti claimed Mr. Inyang registered the vehicles, but admitted he gave Mr. Inyang the names to use on each registration statement. Because Mr. Ekpeti obtained the vehicles for his company, his instructions to use various individual names, instead of Ausnet, for most of the registration statements is extremely curious. It is especially curious in light of the fact Mr. Ekpeti could not identify three of the names he provided. Under these circumstances, a jury could reasonably believe he used fictitious names on three of the registration statements.

Mr. Ekpeti also provided inconsistent statements on the circumstances surrounding the registration of the stolen vehicles. For instance, Mr. Ekpeti told authorities he used his secretary's name on the registration statement of one vehicle because he did not have identification with him when *he* registered it. But later, Mr. Ekpeti testified Mr. Inyang registered all the vehicles. Moreover, Mr. Ekpeti's statement he used his secretary's name because he lacked identification is entirely inconsistent with Mr. Ekpeti's later testimony that he

used his secretary's name because he planned on giving her the vehicle after performing the contract. This inconsistency is even more troubling given Mr. Ekpeti's secretary testified she never knew Mr. Ekpeti registered a vehicle in her name.

Heightening these "unsatisfactory" explanations or inconsistencies is Mr. Ekpeti's failure to produce titles for eleven of the vehicles he transported. The jury apparently rejected Mr. Ekpeti's explanation he was waiting to receive the titles from the auctioneer. While Mr. Ekpeti now argues it is not unusual to receive titles in the mail, he failed to explain to the jury why he did not diligently attempt to obtain the titles months later when he did not receive them.

The next "unsatisfactory" explanation advanced by Mr. Ekpeti centers on his suggestion that nine Ausnet company checks, together with Ms. Sands' testimony, support his contention he cashed the checks and used the proceeds to pay Mr. Inyang for the eleven vehicles at issue. Although these checks were admitted into evidence and considered by the jury, they are not in the record on appeal for our review. Mr. Ekpeti is responsible for insuring all materials on which he relies are part of the record. *See United States v. Stoner*, 98 F.3d 527, 530 (10th Cir. 1996). When an appellant asserts a particular error and the record

does not permit us to evaluate it, we will generally refuse to consider the alleged error. *Id.* (relying on *United States v. Vasquez*, 985 F.2d 491, 495 (10th Cir. 1993) and 10th Cir. R. 10.3).

Moreover, our review of the trial transcript shows several problems existed with the Ausnet company checks on which Mr. Ekpeti relies. First, it is unclear whether Mr. Inyang actually received the proceeds of eight of these checks, even though five of these checks carried a notation they were for purchasing vehicles for the McAlester contract. For example, Ms. Sands could not verify whether the proceeds from seven of the checks, made payable to Mr. Ekpeti and signed by him, were given to Mr. Inyang.[4] In addition, one check for $8,170 was made payable and given to Mr. Inyang, and the other was payable to Ms. Sands. While the check to Mr. Inyang carried the notation it was for vehicle purchases, Ms. Sands could not verify whether Mr. Ekpeti eventually gave the cash proceeds of her check to Mr. Inyang.

Additionally, the evidence shows the Ausnet company checks totaled just

_____

[4] At one point, Ms. Sands testified Mr. Ekpeti left an envelope containing $40,000 in cash for Mr. Inyang, but could not verify whether that money came from these company checks. We leave to the jury any credibility determinations on this and Ms. Sands' other testimony concerning Mr. Ekpeti's cash payments to Mr. Inyang.

-11-

over $85,000, but Mr. Ekpeti offered no other documentary evidence substantiating the remaining source for the money allegedly paid to Mr. Inyang. The jury must have found Mr. Ekpeti's self-serving testimony he obtained bank financing, without further evidence, incredible. It is also apparent the jury disbelieved he cashed Ausnet customer's checks and gave the proceeds directly to Mr. Inyang without first depositing them in Ausnet's account. The jury also apparently rejected Mr. Ekpeti's explanation he paid cash to Mr. Inyang, rather than payment by check, because he wanted to accelerate the purchase time. Finally, even if Mr. Ekpeti actually paid Mr. Inyang for the vehicles, it is not conclusive proof Mr. Ekpeti did not know the vehicles he purchased were stolen.

Under the circumstances presented, it is clear the jury found Mr. Ekpeti's and Ms. Sands' testimony incredible and rejected the notion the documentary evidence presented substantiated Mr. Ekpeti's contentions. This, together with the other evidence presented, shows Mr. Ekpeti failed to provide a satisfactory explanation to the jury concerning his possession of eleven of the twelve stolen vehicles.[5] Instead, circumstantial evidence and inferences drawn therefrom

---

[5] We find Mr. Ekpeti's reliance on *United States v. Mann*, 557 F.2d 1211 (5th Cir. 1977), unpersuasive and the facts distinguishable. In *Mann*, the defendant repaired and then purchased a vehicle from one of his customers, which turned out to be stolen. *Id.* at 1216. However, the evidence was either 1) insufficient to show the defendant knew the vehicle was stolen, or 2) improperly had a prejudicial impact on the jury. *Id.* at 1213-15,

establish sufficient evidence existed to support the jury's verdict.

### B. Application of United States Sentencing Guideline § 2B1.1

Over Mr. Ekpeti's objection, the district court applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(4)(A) for "more than minimal planning" in committing the interstate transportation of eleven stolen vehicles. The district court based this enhancement, in part, on the fact Mr. Ekpeti "committed repeated acts of knowingly transporting stolen motor vehicles in interstate commerce." On appeal, Mr. Ekpeti contends the district court erred because only two shipments of stolen vehicles cannot constitute "repeated acts." In support, Mr. Ekpeti relies on *United States v. Bridges*, 50 F.3d 789, 792 (10th Cir. 1994), in which we defined "repeated acts" to mean more than two.

"We review the district court's application of the Sentencing Guidelines de novo and the district court's factual determinations for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Vallo*, 238 F.3d 1242, 1250 (10th Cir. 2001) (quotations marks and

1217-18. In contrast, in this case, sufficient circumstantial evidence, together with Mr. Ekpeti's unsatisfactory explanation for his possession of eleven of the twelve stolen vehicles, supported the jury's determination he knew they were stolen.

citation omitted). "A district court's factual finding is clearly erroneous only if it is without factual support in the record or if this court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks, alteration, and citation omitted).

In applying this standard of review, we note U.S.S.G. § 2B1.1(b)(4)(A) requires a two-level increase in offense level if the offense involved "more than minimal planning." Under the Sentencing Guidelines, "more than minimal planning" occurs "(1) where there are one or more acts involving more planning than is typical for committing the offense in its simple form; (2) where affirmative steps are taken to conceal one or more acts; and (3) where there is a series of acts over a period of time, regardless of the level of planning involved in each, unless each is purely opportunistic." *Bridges*, 50 F.3d at 791. Instances involving any one of these three criteria is sufficient to warrant an enhancement for "more than minimal planning." *Id.*

Directing our attention to the third criteria, with which Mr. Ekpeti is most concerned, the Sentencing Guidelines define "more than minimal planning" as present in any case involving *repeated acts* over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, comment. n.1(f)

(emphasis added); *see also* U.S.S.G. § 2B1.1, comment. n.1 (referring to the definition of "more than minimal planning" in the commentary to § 1B1.1); *cf. United States v. Yost*, 24 F.3d 99, 105 (10th Cir. 1994) (relying on same definition in applying § 2F1.1(b)(2), which contains a similar reference to § 1B1.1's commentary). As Mr. Ekpeti contends, we have defined "repeated acts" as meaning "more than two instances of the behavior in question." *Bridges*, 50 F.3d at 793. In applying this definition to the instant case, it is important to note that we and other circuit courts have determined the transportation of each individually stolen vehicle is subject to individual prosecution under 18 U.S.C. § 2312, even though the vehicles proceed in a single convoy. *See United States v. Kitowski*, 729 F.2d 1418, 1423 (11th Cir. 1984) (relying on *United States v. Van Cleave*, 599 F.2d 954, 956 (10th Cir. 1979) and other circuit cases supporting the same proposition).

Given our standard of review and the applicable law, it is clear in this case that the district court did not error in applying the two-level enhancement to Mr. Ekpeti's sentence. Because each stolen vehicle constitutes a single offense under § 2312, it follows that the district court may likewise consider each stolen vehicle in determining whether Mr. Ekpeti committed repeated acts of interstate transportation of stolen vehicles. In this case, Mr. Ekpeti's transportation of

eleven stolen vehicles represents eleven repeated acts of transporting stolen vehicles. This constitutes "more than minimal planning" under § 2B1.1(b)(4)(A) despite the fact all eleven vehicles were transported in just two convoys.[6] Because the "repeated acts" criteria is sufficient to support the two-level enhancement, we need not address the other two criteria in determining whether Mr. Ekpeti's behavior or conduct show he did "more than minimal planning."[7]

---

[6] On appeal, Mr. Ekpeti concludes we need not determine whether his acts were engaged in "over a period of time" because the two shipments were not "repeated." Having determined repeated acts occurred, we also conclude they occurred "over a period of time." U.S.S.G. § 1B1.1 comment. n.1(f). Mr. Ekpeti's actions in receiving possession of the stolen vehicles, painting and equipping them, arranging their transportation, and ultimately transporting them, occurred over a twenty-five day period. Under the circumstances in this case, we believe this period is sufficient to meet the "over a period of time" requirement. *See, e.g., United States v. Hill*, 197 F.3d 436, 445-46 (10th Cir. 1999) (holding check fraud scheme developed over two days and executed over ten days constituted repeated acts over a period of time); *Yost*, 24 F.3d at 105 (insurance fraud scheme evolving over period of one month sufficient to support "more than minimal planning" enhancement); *United States v. Mullins*, 996 F.2d 1170, 1170-71 (11th Cir. 1993) (holding theft and transportation of three vehicles in thirty days, in violation of 18 U.S.C. § 2312, constituted "repeated acts over a period of time.").

[7] Even though we need not address the other two criteria for showing "more than minimal planning," we nevertheless conclude Mr. Ekpeti's actions meet both criteria. First, Mr. Ekpeti's conduct in taking possession, painting, equipping, assisting in the registration, and initiating the transportation, of the stolen vehicles shows he took "affirmative, premeditated steps" before transporting them across state lines. *Mullins*, 996 F.2d at 1171. Thus, his actions involved more planning than is typical for committing the offense of stealing a vehicle, as required by the first criteria. *See Bridges*, 50 F.3d at 791. Second, Mr. Ekpeti's behavior in painting the vehicles and registering them in various names, including fictitious names, is sufficient to show he took affirmative steps to conceal the fact the vehicles were stolen, as required by the second criteria. *See id*. While the district court's decision to apply the enhancement centered primarily on the "repeated acts" criteria, we may nevertheless affirm "'on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied

## C. Failure to Depart Downward

Mr. Ekpeti filed his own motion for a downward departure which the government opposed and the district court denied. On appeal, Mr. Ekpeti claims the government improperly failed to request a downward departure motion under U.S.S.G. § 5K1.1 because it applied the "wrong standard." Specifically, Mr. Ekpeti argues the prosecutor's objection to his motion at the sentencing hearing reflects his mistaken conclusion § 5K1.1 requires the defendant to assist in connection with the case with which he was charged.

Generally, we lack jurisdiction to review a sentencing court's refusal to depart downward. *See United States v. Fortier*, 180 F.3d 1217, 1231 (10th Cir. 1999). We further point out that § 5K1.1 requires the district court to consider downward departure for substantial assistance only on a motion by the government, and not on Mr. Ekpeti's own motion. *See United States v.* Duncan, 242 F.3d 940, 944 (10th Cir. 2001); *United States v. Lee*, 989 F.2d 377, 379 (10th Cir. 1993). While certain limited exceptions to this requirement exist, *Duncan*, 242 F.3d at 946-47, we need not address them in this appeal. This is because the record before us does not show Mr. Ekpeti raised his "wrong standard" argument

upon by the district court.'" *Schaffer v. Clinton*, 240 F.3d 878, 886 (10th Cir. 2001) (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)).

before the district court and, therefore, he did not preserve it for appeal.[8]  *Id.*


For the reasons stated, we **AFFIRM** the district court's judgment.  Mr.

Ekpeti is represented by the Office of the Public Defender, but has nevertheless

filed a *pro se* motion to proceed *in forma pauperis* which we deny.  We grant Mr.

Ekpeti's motion to file his reply brief "out of time."


**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge

---

[8]  We note Mr. Ekpeti refers to the egregious case exception to the government motion requirement under § 5K1.1 for the first time on appeal.  This argument is unavailing, because we held this exception was eliminated by the Supreme Court in *Wade v. United States*, 504 U.S. 181 (1992).